## ·CLARK *v.* STATE.

[74 South. 127, Division B.]

1. HOMICIDE. *Burden of proof. Intent.*

In a prosecution for assault and battery with intent to kill and murder, the burden of proof is upon the state to show the intent to kill and murder and to show this beyond all reasonable doubt.

2. HOMICIDE. *Evidence. Assault with intent to murder.*

Where in a prosecution for assault and battery with intent to kill and murder, there is no evidence to support a finding of deliberation or premeditation, though there was sufficient evidence to support a verdict of assault and battery committed in the heat of passion, the court was not warranted in submitting to the jury the issue of defendant's intent to murder.

3. CRIMINAL LAW. *Misconduct of prosecutor. Cross-examination.*

In the cross-examination by the district attorney in this case the court held that the tendency of the examination copied in the statement of facts herein was an appeal to very natural prejudices and impulses of the jurors, was largely a reliance for conviction upon the honor of Masonry and the dishonor of a bank failure and was improper.

APPEAL from the circuit court of Claiborne county.

HON. E. L. BRIEN, Judge.

T. F. Clark was convicted of an assault and battery with intent to kill and murder and appeals.

Appellant was convicted by the circuit court of Claiborne county of assault and battery with intent to kill and murder Dr. E. P. Jones. He was sentenced to a term of three years in the state penitentiary, and from this judgment prosecutes an appeal. The assault occurred at a regular meeting of the Masonic Lodge at Hermanville, and was provoked by discussion of certain charges presented by the committee on complaints and offenses against J. W. Clark, the brother of appellant. It appears that Dr. E. P. Jones, the party assaulted, had been president of the Bank of Hermanville while J. W. Clark, brother of appellant had, been cashier of this bank; that the bank had failed and gone into the hands of a receiver; that the cashier, J. W. Clark, had been indicted, once convicted by the circuit court, had appealed his case and obtained a reversal, and upon a second trial the jury had been unable to agree and a mistrial had been entered. Shortly after the mistrial upon the indictment charging J. W. Clark with embezzlement, Dr. Jones, as chairman of the committee on complaints and offenses, presented to the Masonic Lodge the report hereinafter copied in full. It appears that the Masonic Lodge building had burned, and the meeting at which the difficulty occurred, by special dispensation, was being held in the Presbyterian Church in Hermanville. The report is as follows:

"To the Worshipful Master, Wardens, and Members of Pattona Lodge, No. 232, A. F. & A. M.:

"The committee of the above-named lodge, on complaints and offenses, having received information that Brother John W. Clark, a member of this lodge, has been guilty of un-Masonic conduct, have investigated the same as required by rule No. 8 on Masonic discipline, and file the following specifications and charges:

"We find that prior to February 1, 1914, for a long time the said Brother John W. Clark was cashier of the Bank of Hermanville, and as such received money for deposit in said bank, and paid the same out on the checks of the depositors, and that a large number of people deposited money in said bank from time to time.

"We find that this lodge was a depositor in said bank, and that quite a number of members of this lodge were depositors in the said bank, and that a large number of women, and school teachers were also depositors in the said bank.

"We further find that on the 14th of March, 1914, the said Bank of Hermanville closed its **doors, on** account of lack of funds with which to do business, and has ever since been out of business.

"We find further that the reason the said bank was forced to close its doors and go out of business, was because the said John W. Clark, while cashier of the said bank, embezzled the funds of the said bank, including the deposits of all of the above-named depositors, and that the grand jury indicted him, the said John W. Clark, for embezzling the funds of the said bank to the amount of more than eighteen thousand dollars, whereby the said bank and its depositors have lost a great deal of money.

"Wherefore, we, the said committee on complaints and offenses, charge: That the said John W. Clark has been and is guilty of un-Masonic conduct, in this, that he has embezzled money belonging to the Bank of Hermanville.

"That he has and is further guilty of un-Masonic conduct, in the said embezzlement by appropriating to his own use money that was on deposit in the said bank, as the funds and property of Pattona Lodge No. 232, to the amount of one thousand dollars and some odd cents.

"That he, the said John W. Clark, was and is further guilty of un-Masonic conduct, by appropriating to his own use money that was on deposit in said bank by individual members of said lodge, thereby cheating, wronging, and defrauding brother master Masons.

"That he, the said Brother John W. Clark, was and is further guilty of un-Masonic conduct, by appropriating to his own use money that was on deposit by widows and orphans in the said bank, and thereby violating the cardinal virtues of our ancient and honorable institution, by such un-Masonic and disreputable conduct.

"And therefore your committee recommend that the said Brother John W. Clark be brought to trial on these charges.

"Very respectfully submitted, this 16th day of March, A. L. 5916, A. D. 1916."

In the regular order of business this report was read by Dr. Jones. When Dr. Jones had finished reading the report, Dr. A. L. Chapman, the professional partner of Dr. Jones and a brother-in-law of appellant, arose and addressed the lodge, urging that the charges be dropped pending a final decision by the court as to the guilt or innocence of J. W. Clark and pleading for harmony amongst all members of the lodge. Dr. Jones thereupon arose and responded to the pacific speech of Dr. Chapman and, to employ the exact language of Dr. Jones himself, stated: "I don't think there is a Mason in the sound of my voice that doesn't know he is guilty of these charges." This statement appears to have been first resented by a Mr. Torrey, who remarked: "I don't know whether I believe it or not, Doctor," and thereupon Frank Clark, the appellant, stated, "It's a lie." Dr. Jones concluded his remarks in a few words and then advanced around the stove, seems to have been between him and the place where appellant was sitting, and in going over in the direction of appellant addressed Mr. Clark and asked: "What did you say, Frank?" Clark then arose and stated, "I said that was a damn lie." Jones, still advancing, said, "You can't talk to me that way," at the same time gestulating with his right hand and pointing his index finger at appellant. The testimony is conflicting as to just how much, if any, appellant advanced towards Jones. The parties met near the seat upon which Frank Clark had

been sitting, and, as they did so, appellant struck Dr. Jones in the side of the neck with a penknife and inflicted a serious wound. Jones shoved appellant back upon the seat where he had been sitting, and at that time fellow Masons interfered, separated the parties, and found that Dr. Jones had been cut. Dr. Chapman thereupon took charge of Dr. Jones and led him out of the lodge room to their office for medical attention. It appears that the church was dimly lighted by means of two coal oil lamps, one sitting upon an organ by which Dr. Jones stood to read his report, and the other stationed upon a small table in front of the master. The evidence is conflicting as to the distance between the front pew upon which Dr. Jones had been sitting and the station or seat occupied by the appellant. Witnesses estimate this distance from ten to twenty feet. It appears that Dr. Jones, instead of returning to the place where he had been sitting, proceeded toward appellant in the opposite direction and around the stove and behind the table at which the master of the lodge was sitting. There was evidence that the blood which spurted from the wound left its imprint upon the floor immediately in front of the bench on which appellant was seated.

It was the contention of the state that Dr. Jones was simply performing his Masonic duty in presenting the report, and that in approaching appellant Jones had no intention of doing Mr. Clark any bodily harm whatever, but that Jones expressly stated as a part of the *res gestae*, "This is no place for a difficulty." It is the theory of the defense that Dr. Jones assaulted and struck at appellant, and that appellant acted in self-defense and in apprehension of danger. It is the further contention of the defense that unnecessary remarks of Dr. Jones, assuming the guilt of John W. Clark of embezzling the funds of widows, orphans, and Masons, provoked the difficulty, and that appellant acted under the impulse of the moment and while aroused over what he regarded as an insult to his brother.

Numerous witnesses testified for and against the defendant, and the court submitted to the jury the issue of intent to kill and murder. The small knife used by appellant on this occasion was introduced in evidence and transmitted with the record of this appeal for the inspection of the justices of this court. The knife is a small, one-bladed, rather worn, and weak-backed instrument. The principal point relied upon by appellant is the alleged error of the court in submitting to the jury the question of intent to murder, it being the contention of appellant that no malice or deliberation whatever is shown by the proof.

Complaint is made also of the language and conduct of the district attorney in cross-examining some of the witnesses, and especially to the following questions and answers propounded to one of the witnesses for the defense:

"Q. You mean turn loose a man that cuts another man's throat? Is that your idea of justice? Cut another man's throat after he had called him a liar twice in a Masonic Lodge and you want to turn him loose; is that your idea of justice? (Objection. Overruled. Exception.) Witness: Repeat that, please. Q. Your idea of justice is to let a man cut in the Masonic Lodge—you are a Mason? A. Yes, sir. Q. For a man to go in a Masonic lodge and another brother Mason prefer charges which it was his duty to do and he was required to do, and he makes charges not against one man but against his brother in an orderly, respectful, and perfectly proper manner, and his brother jumps up and calls him a liar twice, he says, 'what did you say, Frank?' and he calls him a liar again, and, because he walks over to him, he cuts his throat and you want him turned loose on the ground that it is justice? (Objection. Overruled. Exception.) . . . Q. Did Dr. Jones say anything to Frank—this bad man you are talking about? A. He charged his brother with stealing. Q. He ain't the only person that ever charged his brother with stealing? A. I don't suppose so. Q. If Frank Clark killed all the people that charged his brother with steal-

ing for the last two years, he would depopulate this whole county, would he not; about kill everybody down here? A. They are not all Frank's brothers. (Objection. Overruled. Exception.) Q. I say if Frank Clark, the defendant here, would undertake to cut every man's throat in Claiborne county who had brought charges in connection with that bank failure against his brother, John Clark, he would kill a good many people in this county would be not, and good men too? A. If they would all try to jump on Frank. . . . Q. Now, if Frank Clark would undertake to cut the throat of everybody in Claiborne county that accused his brother of peculation with that bank of Hermanville, he would mighty near clean out this community would he not? (Objection. Overruled. Exception.) . Q. Two grand juries here accused his brother of doing it, didn't they? (Objection. Overruled. Exception.) Q. Two grand juries of this county charged his brother with taking eighteen thousand dollars of that bank's money? (Objection. Overruled. Exception.) A. I know he was indicted, but I don't know the sum involved. Q. He was indicted for doing it? (Objection. Overruled. Exception). A. Yes, Sir. Q. Did he ever cut any grand juror's throat? (Objection. Overruled. Exception.) A. I never heard of it. Q. Did he ever accuse any grand juror of being a liar? A. Not that I know of. (Objection. Overruled. Exception.) Q. You have been here at a couple of trials against his brother where witnesses got the books and said he got the money? (Objection. Overruled. Exception.) A. I was not here at the trial. Q. He has not tried to cut any of those witnesses' throats? A. I don't know. Q. Mr. Clark is not the only man the Masons have brought charges against? A. I have heard of others, but no Pattona. . . . Q. You never heard of a Mason before where the lodge was in regular order, where the grievance committee brought a charge against a brother Mason, that he went over and called a man a liar and undertook to cut his throat, in your life? (Objection. Overruled. Exception.) A. No, sir. Q. Is that Mason

conduct? Is that Masonic conduct to call him a liar?
(Objection. Overruled. Exception.) A. No, sir; it is not
Masonic for either party to do as they did. Q. Was it
Masonic for Dr. Jones to prefer the charges as a member
of the committee? A. Yes, sir. Q. Wasn't it his duty?
A. I don't know, but he did."

There are other questions propounded along the same
line and of like character. There is evidence that appel-
lant weighed one hundred and fifty-eight pounds and had
been suffering from rheumatism and was not physically
a strong man. There is evidence, also, that Dr. Jones is
a somewhat heavier man and at times high-tempered.

*J. T. Drake,* for appellant.

The point which I wish to urge is that the evidence
did not warrant a conviction for assault with intent to
kill and murder, but that, if any crime were shown, it
was an asssault with intent to commit manslaughter.
These two crimes are distinct and separate crimes. It
is true they are dealt with in the same section of the Code,
viz., 1043, which fixes the punishment for an assault and
battery with intent to kill and murder, to maim, ravish,
rob or to commit any murder, rape, manslaughter, bur-
glary larceny or other felony. It needs no argument to
show that under this statute a conviction could not be had
under this indictment for assault with intent to kill and
murder, if the evidence showed an assault with intent to
commit, we will say, burglary or rape, and it is of course,
equally true that under an assault with intent to kill and
murder a conviction could not be had of the crime as
charged, if the evidence showed an intent to commit man-
slaughter. There is one Mississippi case which holds
that under an indictment with intent to commit murder
a verdict of assault with intent to commit manslaughter
cannot be found, even though justified by the evidence,
and, so far as we know, that case is still law. *Moorman
v. The State,* 24 Miss. 54.

It is certainly the case to-day that where the evidence shows that if the killing had taken place, the crime would have been manslaughter, the defendant cannot be convicted of an assault with intent to commit murder, the two crimes being different crimes with different penalties and warranted upon a different state of facts.

We do not need to cite the court to authorities that where the facts show manslaughter, a conviction for murder cannot be had, and the latter cases go so far as to hold that where the facts show murder, a verdict of manslaughter cannot be had; and it is unquestionably equally true that where the facts show assault with intent to commit manslaughter, a verdict of assault with intent to kill and murder cannot be had.

This being the case, it is necessary to inquire as to what is manslaughter and what line of demarcation there is between the two crimes of murder and manslaughter. In this case the wound was inflicted in the course of a fight, and, if the crime is manslaughter, it is manslaughter under section 1236 of the Code of 1906, which reads as follows: "The killing of a human being without malice in the heat of passion but in a cruel or unusual manner, without authority of law and not in necessary self-defense, shall be manslaughter."

Section 1238 is substantially to the same effect. We ask the court's attention to it also. This definition is clear and explicit and the distinction between it and murder is essentially the absence of malice and the commission in the heat of passion. There are many Mississippi cases dealing with this distinction and the text writers go into it fully. Bishop states the law as follows:

"A battery need not, to reduce the killing in defense to manslaughter, be such as endangers life. But no words however provoking or insulting, or mere verbal threat will so far justify a blow returned, though in actual passion, as to reduce the killing to the lower degree. Still words give character to acts and in matter of evidence are admissible to explain them. Thus where there is a demon-

113 Miss.—14

stration of impending personal violence yet insufficient alone, accompanying words added to the physical acts, may disclose such peril as will justify the killing of the aggressor or reduce it to manslaughter." See Second Bishop's New Criminal Law, section 703 and 704. 21 Cyc. page 476. All of the authorities state that if the provocation is "adequate," the crime is reduced to manslaughter, and as to what is adequate is governed by the facts in each case. For example, it is held that a blow by a child it not adequate but a blow by a man inflicted upon another man in the absence of malice is always held to be adequate, and, as is shown by the authorities cited above, an impending blow under such circumstances will also reduce the crime to manslaughter.

This being the case, and there can be no doubt as to the above being the law, the only question is asked as to whether the facts show the cutting in the heat of passion and without malice, or whether it was a malicious cutting.

*Flowers, Brown, Chambers & Cooper,* of appellee.

We submit in the first place that the court erred in giving the first, and only instruction for the state and that the verdict of the jury, assault and battery with intent to kill and murder, cannot be sustained on the record before the court.

In other words, we most earnestly contend that, accepting the testimony of the witnesses for the state and placing upon this testimony the most liberal construction against the appellant, the appellant cannot be held to be guilty of assault and battery with intent to kill and murder Jones. On the other hand, if appellant be guilty of anything, it can be nothing more than assault and battery.

At the outset the state will not contradict the statement that a person cannot be found guilty of assault and battery with intent to kill and murder unless it appears that had the assaulted person died the accused would have been guilty of murder.

Wharton's Criminal Law, p. 1051, sec. 839, Vol. 11 thus states the law: "On an indictment for an assault with intent to murder, the intent is the essence of the offense. Unless the offense would have been murder, either in the first or second degree, had death ensued from the stroke, the defendant must be acquitted of this particular charge."

This court recognized this to be the law in the case. *Hibbler* v. *State, Eaverson* v. *State,* 73 Miss. 810, *Canterbury* v. *State,* 90 Miss. 279. Judge CALHOUN in the dissenting opinion thought the offense was done in the heat of passion and that the case should be reversed. The majority considered that it was not done in the heat of passion, and this was a case outrageous in its atrocity.

Would the appellant have been guilty of murder had death ensued? Was the act done in the heat of passion? But counsel will say the jury was instructed that if the act was done in the heat of passion they could not find the appellant guilty as charged and the jury passed upon the question. But the court will note that the evidence we have considered is the evidence accepted by the jury and not that for appellant.

This court's right to take the facts accepted by the jury as true and to say whether it will support the verdict is too well founded. But counsel may say he used a knife. The record shows that Jones was a man weighing one hundred and eighty pounds. Appellant weighs one hundred fifty eight pounds. Page 157 of record. Appellant had suffered with rheumatism for eighteen months. His shoulder muscles and arms were useless on account of this affliction. A man was advancing upon him. And this was in a dimly lighted room when appellant was not able to determine with what weapons he was opposed.

Now, we ask the court on this record where is there to be found the essential elements of murder, the malice, the aforethought? They are not present. And where can we find one scintilla of proof otherwise than that Clark was acting otherwise than on the defensive.

We submit on the record that the verdict is contrary to the evidence and that the court erred in not so holding.

*J. McMartin,* for appellee.

The chief argument advanced in briefs for appellant is: That malice aforethought is not predicable of the record; and that hence the instruction given the state is erroneous, and the verdict is not sustained by the evidence. In this brief for the state a large part of the evidence justifying the giving of the state's instruction is quoted from the record. To summarize here, in reply to the two briefs for appellant, copies of which have been served on the writer of this brief for the state:

First, it was known that charges were to be made against J. W. Clark that night in the Lodge; second, McCaleb had taken John into the vault at the store of John and Frank and told him what? "You tell Frank, I am telling you so you and he may not be taken by surprise. Both of you keep cool tonight. See Testimony of J. W. Clark, Record, pages 146-147. McCaleb does not tell about the vault conference. He says he saw Dr. Chapman though, and Dr. Chapman offered to go with him but he went alone to see Dr. Jones. Dr. Chapman went too. See Dr. Chapman's testimony. Dr. Jones says: McCaleb and Chapman both came to see me, McCaleb first. In the course of the talk with McCaleb, Dr. Jones says McCaleb says: "You will regret it if you do." See Jones' testimony, brought out on cross-examination. When the lodge opens Frank is there, and he is seen whetting his knife on his shoe. See the testimony of Pitts. When he "gave Dr. Jones the damned lie is when I first saw the knife in his hand." See Record. Bridger's testimony. (This before Dr. Jones had asked him "what did you say Frank?" Dr. Jones saw him with his hands concealed behind him, as he, Frank, advanced towards him, Jones. See Dr. Jones' testimony.

Finally, as Dr. Jones turned towards the Worshipful master, as if to address him, Frank buries his knife, which he had been rubbing on his shoe, which Bridger

saw in his hand, and which was evidently in his hand concealed as Dr. Jones saw him advancing towards him, with his hand behind him, in the back of Dr. Jones' neck, draws around the neck towards the front of the distance of six or seven inches, severs the outside jugular vein, lays bare the inner jugular vein, destroys the sensory nerves, and the blood spurts out. Dr. Jones feels the blow on the neck, thinks appellant had scratched him with his finger nails, turns and with open hand after he was cut pushes him and says "sit down." Frank jumps up and is restrained from further attack by bystanders. That Dr. Jones' side was to him is too truly attested by the position of the gash on his neck. So Clark was not and could not be resisting any assault on himself. If he was very attendant to part of the testimony, every surrounding circumstance, every presumption shows premeditation, antecedent preparation, fixed purpose to do what he did do. The jury believed and found him guilty. Dr. Jones tells how, if he had been cut at from the front his main jugular vein would have been severed, and he would have been a dead man in an instant.

What, in view of the above summary of testimony becomes of appellant's contention, in briefs being considered, that he did it in heat of passion? That if death had occured only manslaughter could have been maintained, if any thing?

When appellant and his brother knew charges were to be made against John why didn't they both, observing the rules of common decency, remain away? Why did not McCaleb, Chapman, Torrey and Foster say to them: Boys, conventionalities, to say nothing of what might be your personal feelings, suggest that you do not go to the Lodge tonight. We suggest that you stay away and leave the matter to your friends. Masonic Rules require that all charges shall be hereafter investigated so John will have a fair hearing.

Much is said about Frank's outraged feelings as influencing his conduct, in one of the briefs for appellant. It

might be retorted with force and reason; that is if his feelings were outraged he was acting with premeditation, since he knew what was coming and went to the Lodge with his knife, being prepared for deadly work even in the Lodge meeting and in the Church.

From appellant's view point, Dr. Jones had the right to suppose he was under the protection of the laws; and had the right to perform the duty which his position as chairman of the grievance committee put upon him. Yet, when Dr. Chapman was referring to the courts and John's trials in court, Dr. Jones, with the "Blue Book" and "Thomas' Digest" in his hands, was saying or did say: Masonic Lodges do not await court action. The masonic law prescribes the course and I am following it. See Dr. Jones' testimony.

In conclusion, it is respectfully urged that not a single point made by appellant shows error in the trial court. That it was fortutitous, indeed that he is not before the court on charge of murder. That some overweening providence diverted the point of his murderously driven knife, and saved to Dr. Jones' wife and children the life, which if it had been taken would have made of one a widow and four children orphans, all deprived of his protecting and turtoring guidance and protection.


STEVENS, J., delivered the opinion of the court.

(After stating the facts as above).  We have not and shall not undertake to detail all the evidence in this case. To do so would be a tedious and useless task. We have briefly outlined in the statement of facts that part of the testimony tending to shed light upon the main question which we shall discuss in this opinion, and that is: Whether the proof offered by the state warranted the summission to the jury of the question of felonious intent to kill and murder, and whether the verdict of the jury convicting appellant of a felony should be sustained. The court, under usual instructions, authorized the jury to say

by their verdict that appellant, at the time he committed
the assault, intended to take Dr. Jones's life.   The evi-
dence is conflicting on the issue of self-defense—whether
appellant was justified in inflicting the wound under the
belief that Dr. Jones was endeavoring to do appellant
great bodily harm.   Under all the testimony on behalf of
the state, the jury was fully warranted in believing that
appellant was in fault and wrongfully assaulted Dr. Jones.
If appellant therefore had been convicted of assault and
battery, we would unhesitatingly say that the proof justi-
fied the verdict.   But what of the more serious element of
the offense—the intent to kill and murder Dr. Jones?
Does the proof justify the finding by the jury that appel-
lant intended to take life?

In arriving at a correct solution of this question, it is
well to remember the burden of proof was upon the state
to show the intent to kill and murder and to show this be-
yond all reasonable doubt.   It is argued by counsel es-
pecially employed in the prosecution of this case that ap-
pellant attended the meeting of the Masonic Lodge in com-
pany with other members of his family with the purpose
of making trouble.   The proof, as we see it, does not
justify any such inference.   There is no sufficient showing
of a conspiracy between appellant and his brother, John
W. Clark, or any of his brothers-in-law.   There is a strong
intimation that appellant had knowledge of the purpose
of the grievance committee to prefer some kind of charg-
es against appellant's brother.   The nature of these charg-
es could not be accurately known in advance.   The specifi-
cations were for the first time disclosed when Dr. Jones
read the committee's report in open session of the lodge.
It will be observed that this report is languaged in most
emphatic terms. It really does not so much submit charges
as conclusions already reached by the members of the com-
mittee.   The language of the committee is that "we find."
The committee therefore, without an opportunity to John
W. Clark to be heard in defense, finds the facts against
him.   These conclusions of the committee are also very

far-reaching and the charges very caustic. The committee finds that John W. Clark has embezzled the funds of the bank, the funds of depositors, the funds of helpless widows and orphans, the funds of Pattona Lode No. 232, and the funds of individual brother Masons. When these most sweeping charges were being read by Dr. Jones, appellant said nothing. It was only when Dr. Jones, in addressing the entire membership and in answering the pacific speech of Dr. Chapman, made the unnecessary statement, "I don't think there is a Mason in the sound of my voice that doesn't know he is guilty of these charges;.. that appellant resented the remarks and attitude of Dr. Jones. It is true that appellant used intemperate language—words which he should not have employed. However, there certainly would have been no difficulty if Dr. Jones had resumed his seat without following up this wrongful remark of appellant, but when appellant stated, "It's a lie," Dr. Jones, in a very human fashion, resented the words employed by Clark and in doing so practically made an assault upon him. Dr. Jones proceeded in the direction of appellant and around behind the master's table and both spoke and acted in a manner that amounted to a demonstration of his indignation. The evidence is conflicting as to whether he struck at appellant. According to the state's evidence. He made no effort to hit Clark, but was wrongfully stabbed by appellant just as Dr. Jones turned his head to address the master of the lodge. The undisputed testimony shows, however, that the anger of both men was kindled by intemperate language employed by each of them; and under all the circumstances, we are firmly of the opinion that when appellant struck at Dr. Jones he did so under the impulse of the moment, while his blood was hot and his anger and passion aroused. This is manifest from the entire setting and all the circumstances surrounding the assault. Dr. Jones is a reputable citizen and distinguished physician. The proof indicates that Mr. Clark is a member of a good and worthy family and a man of previous good character and

standing in the community.  Appellant's interest in his
brother would be most natural and human.  The sweep-
ing charges and the caustic remarks of Dr. Jones would
very naturally arouse appellant's feelings.  Appellant's
resentment of these charges and the statement that
every Mason in the lodge knew the charges were true
was most natural, regardless of the guilt or innocence of
John W. Clark.  It is a plain and simple case where two
reputable and red-blooded men became aroused under
under the impulse of the moment, and where unfortunate-
ly appellant acted hastily and wrongfully.  In doing so,
however, he dd not act with that deliberation, that design,
that malice aforethought which indicates an intent to com-
mit murder.  We think therefore it was error on the part
of the trial court to submit the issue of intent to kill and
murder to the jury  There is not sufficient proof to sus-
tain the felony part of the charge.  There is here no evi-
dence whatever of previous threats, malice, or ill will.
Dr. Jones himself says, ''I was not looking for anything''
in the way of trouble; and, at another place in his testi-
mony: ''I didn't know he wanted to hurt me.  .  .  .  I had
nothing in the world against Frank Clark and never had
in my life.'' The witnesses for the state justify the conclu-
sion that Dr. Jones was excited when he approached ap-
pellant and, whether intentional or not, actually made a
demonstration.  Mr. Bridger, one of the witnesses for the
state, says.  ''Bob Herrington was with Dr. Jones and
had told of him.''  Mr. Flowers, another witness for the
state, says, ''He started toward Frank shaking his finger
or hand at him,'' and also that Dr. Jones ''is pretty high-
tempered.''

If there was no premeditation and malice, there would
have been no murder in the event the wound had proved
fatal.  It is stated by Mr. Wharton that:

''Provocation in law is used in the ordinary acceptation
of the word, and means that treatment of one person by
another which arouses anger or passion.

"By mitigation, it may reduce the grade of an offense, but it never justifies a crime. In homicide it negatives the idea of premeditation and malice, because the hot blood engenered by provocation produces a temporary suspension of the reflective faculties, and the passion aroused excludes the idea of deliberation. Hence, the rule as to the measure of proof is, after the evidence has been submitted on both sides, 'Is it sufficient to cast a reasonable doubt on the essential averments of the indictment? If it is sufficient for this, the defendant is entitled to an acquital.' " 1 Wharton's Criminal Evidence, p. 679.

We are constrained to hold, also, that the learned district attorney, by his method of interrogating the witnesses and in referring to the embezzlement charges against John W. Clark, exceeded the bounds of legitimate examination and inquiry. It appears that there had been a bank failure at Hermanville, and that John W. Clark, cashier, and brother of appellant, had been indicted for embezzlement growing out of this failure. The district attorney assumed the guilt of John W. Clark and ridiculed the idea that appellant, the brother, should attempt to resent any charge of John W. Clark's guilt. Much stress is also laid by the district attorney upon the un-Masonic conduct of appellant. The tendency of the examination copied in the statement of facts was an appeal to very natural prejudices and impulses of the jurors. It was largely a reliance for conviction upon the honor of Masonry and the dishonor of a bank failure.

Reluctant as we are to upset the findings of a jury, we are compelled to set aside the judgment of conviction and to remand the cause for a new trial. It is not so much a question of guilt or innocence of any crime, as a question of the grade of offense committed. A white man of previous good character and reputation has been sentenced to the state penitentiary. The finding of the trial court brands him as one who intended to do murder. An assault and battery under the heat of passion is a very different thing from a premeditated design to take life.

*Reversed and remanded.*